UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID FAUPEL,                           )
                                        )
              Plaintiff,                )
                                        )
        v.                              )      No. 4:09 CV 1659 RWS/DDN
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
              Defendant.                )


**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

      This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff David Faupel for disability insurance benefits
under Title II of the Social Security Act, and supplemental security
income under Title XVI of the Social Security Act, 42 U.S.C. § 401, et
seq. The action was assigned to the undersigned United States Magistrate
Judge for review and a recommended disposition under 28 U.S.C. § 636(b).
For the reasons set forth below, the undersigned recommends that the
administrative law judge's decision be affirmed.


**I.   BACKGROUND**

      Plaintiff David Allen Faupel was born on July 15, 1960. (Tr. 87.)
He is 5'8" tall with a weight that has ranged from 154 pounds to 158
pounds. (Tr. 166, 175.) He is divorced from his wife and has two
children from that marriage. (Tr. 88.) He is currently living with a
female friend; together, they care for a number of foster children.[1] (Tr.
23, 30.) He obtained an 11th grade education and received his GED after
joining the Navy. (Tr. 23.) He last worked in September of 2006. (Tr.
23.)

_____

      [1]Since Faupel and his friend are not adoptive parents of these
children, the number they care for varies. The number has ranged from
two to ten. (Tr. 281.)

On January 22, 2007, claimant applied for disability insurance benefits, alleging he became disabled on December 21, 2006, on account of back problems, pain in the left leg and foot, and a fused right knee. (Tr. 43, 85, 111.) On that day he also applied for supplemental security income. (Tr. 95-101.) He received a notice of disapproved claims on May 4, 2007. (Tr. 43-47.) After a hearing on February 17, 2009, the administrative law judge (ALJ) denied benefits on March 2, 2009. (Tr. 8-18, 19-39.) On August 8, 2009, the Appeals Council denied Faupel's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II.  MEDICAL HISTORY

In 1981, Faupel was involved in a motorcycle accident that severed his right leg. It was reattached via surgery, but as a result his right knee is fused. In addition, his right leg is substantially shorter than his left; even wearing special shoes with a 1 3/4 inch lift on the sole and 2 inch lift on the heel, his right leg remains approximately 7/8 inch shorter than his left. (Tr. 272, 286, 298.)

On January 15, 2004, Faupel received an MRI of the L-spine.[2] The MRI showed a mild concentric disc bulge without significant central

---

[2]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

stenosis at L3-4.[3]  At L4-5, there were changes of disc desiccation, again without stenosis.[4]  (Tr. 160-61.)

On March 29, 2005, an x-ray of the L-spine was performed.  The interpreting radiologist found "minor degenerative changes" and the possibility of spondylolysis at L5.[5]  (Tr. 159.)

On June 21, 2006, Faupel saw Janene Nolie, RN, for primary care treatment at the Veteran's Hospital.  Nurse Nolie listed Faupel's prescriptions.  At this time, he was taking Acetaminophen, Flunisolide, Gabapentin, Hydrocodone, Ibuprofen, and Loradatine.[6]  At the examination, Faupel complained of additional stress due to problems with one of his foster children.  He also reported trouble sleeping and sexual difficulties.  Nurse Nolie renewed Faupel's prescriptions to treat his continued pain.  Nurse Nolie also noted gastroesophageal reflux disorder (GERD) and elevated blood pressure.  (Tr. 227-30.)

On July 20, 2006, Faupel underwent a biopsychological health screening with Robert McClain, licensed clinical social worker.  Faupel complained of low energy and trouble falling asleep.  McClain diagnosed

---

[3]Stenosis is the narrowing or constriction of any canal.  Stedman's Medical Dictionary, 1473.  Spinal stenosis refers to the narrowing of the spinal cord.  Spinal narrowing does not always cause problems, but if the narrowed areas compress the spinal cord or spinal nerves, symptoms may develop, such as: pain or cramping in the legs after prolonged standing (pseudoclaudication); radiating back and hip pain; neck and shoulder pain; loss of balance; and loss of bowel or bladder function.  MayoClinic.com, http://www.mayoclinic.com/health/spinal-stenosis/ds00515/ dsection=symptoms (last visited December 20, 2010).

[4]Desiccation is dehydration.  Stedman's Medical Dictionary, 422.

[5]Spondylosis is the stiffening or fixation of the joints within the vertebra.  Stedman's Medical Dictionary, 1456.

[6]Flunisolide is an inhalant and corticosteroid used to help prevent asthma symptoms such as wheezing and shortness of breath.  Gabapentin is used to help control seizures.  Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain and swelling.  Acetaminophen is used to treat mild to moderate pain.  Loratadine is used to treat allergy symptoms.  WebMD, http://www.webmd.com/drugs (last visited December 20, 2010).

Faupel with clinical depression with secondary symptoms of anxiety. Faupel was assigned a GAF score of 45.[7] (Tr. 225-27.)

On July 24, 2006, Faupel saw Katherine Downey, resident physician, for physical rehabilitation at the Veteran's Hospital. Faupel complained of continued pain and trouble sleeping. Faupel reported receiving some relief from pain from a transcutaneous electrical nerve stimulation unit. Dr. Downey increased his dosage of Gabapentin and prescribed Remeron to aid his insomnia.[8] (Tr. 223-24.)

On August 8, 2006, Faupel saw McClain for a follow up mental health visit. At this time, McClain and Faupel developed a treatment plan that would include medication and continued counseling. McClain expressed hope that the medication would provide benefit for both his sleeping and depression issues. (Tr. 222.)

On August 14, 2006, Faupel met for the first time with Michelle Twitty, Pharm. D. Faupel reported routinely drinking two cups of coffee in the morning and Pepsi throughout the day. Dr. Twitty discussed other options for hydration that would not affect his sleep patterns. Dr. Twitty noted that Faupel's largest complaint was of "head racing keeping him awake at night," but that he denied other symptoms of bipolar disorder. She opined that Faupel's caffeine intake was "extreme," and that his depression issues likely had a pain component. Dr. Twitty observed that Faupel was alert and fully oriented, showed normal, logical, and goal-directed thoughts, showed intact memory and good judgment, and was attentive. Dr. Twitty diagnosed depression not

---

[7]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[8]Remeron, or Mirtazapine, is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited July 10, 2010).

otherwise specified and assigned Faupel a GAF of 55.[9]  To treat his mental impairments, Dr. Twitty prescribed Citalopram and Trazodone.[10]  (Tr. 215-21.)

On August 29, 2006, Faupel engaged in a telepsychiatry session with Dr. Twitty.  Faupel reported continued insomnia, and Twitty recommended increasing the dosage of trazodone.  At this point, the phone call was disconnected.  Dr. Twitty could not get back in touch with Faupel that day, and she left a voice message.  (Tr. 213.)

On August 30, 2006, Faupel returned Dr. Twitty's voice mail and reported sleeping better with an increased dose of Trazodone.  He also had switched to a caffeine free soda, but did not notice any change in sleep.  (Tr. 214.)

On October 16, 2006, Faupel stepped in a rut in a parking lot at work, injuring his ankle.  (Tr. 239.)

On November 3, 2006, Faupel went to the Veteran's Hospital for a physical examination follow-up, and was seen by Amy Downey, L.P.N. Faupel complained of continued pain due to having to stand constantly at work.  He further reported that Vicodin was not controlling his pain.[11] (Tr. 208.)

On November 27, 2006, Faupel saw Paul Jones, D.O., for a physical rehabilitation consultation.  Dr. Jones noted good strength, but very poor reflexes.  An electromyography (EMG) was normal and showed no

---

[9]On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[10]Citalopram is an anti-depressant used to treat depression. Trazodone is also used to treat depression. WebMD, http://www.webmd.com/drugs (last visited July 10, 2010).

[11]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 10, 2010).

evidence of left lumbosacral radiculopathy.[12] Faupel complained of pain down his left leg and buttocks. (Tr. 204.)

On December 7, 2006, Faupel saw Osvaldo Acosta-Rodriguez, M.D., for treatment related to his injury received at work. Faupel complained of numbness and pain in his leg unlike anything else he had experienced. He blamed the pain for his insomnia. Dr. Acosta-Rodriguez recommended ice and continued Ibuprofen. He noted that Faupel had a flat affect and was in no apparent distress. Dr. Acosta-Rodriguez opined that despite complaining of severe pain with a nine out of ten intensity, Faupel did not show any pain related behavior during the examination, which made "absolutely no medical sense" to him. Dr. Acosta-Rodriguez returned Faupel to work but restricted him from squatting, climbing, bending, pulling, or pushing, and directed him to sit down 50% of the time. (Tr. 180-81.)

On December 11, 2006, Randall Smith, M.D., wrote a recommendation letter concerning Faupel's work abilities. Attributing limitations stemming from a herniated disc at L4-5 and possible spondylolysis, Dr. Smith recommended the following restrictions: no more than thirty minutes at one time or three hours in a day standing or walking; no lifting more than twenty-five pounds occasionally or forty pounds during the day; no frequent bending or lifting; the ability to change positions frequently and take a break from sitting or standing positions often. (Tr. 162.)

On December 11, 2006, Faupel had a follow up with Dr. Acosta-Rodriguez. Faupel complained of pain in his hip and leg, but failed to keep a pain log or take Ibuprofen as instructed. During a physical examination, Dr. Acosta-Rodriguez opined that Faupel had a flat affect and had no groaning, moaning, grimacing, or other pain behaviors. Dr. Acosta-Rodriguez opined that he could find no evidence of any type of pain. In order to determine whether the alleged pain stemmed from his work-related injury or his existing injuries, Dr. Acosta-Rodriguez

---

[12]Electromyography is a method of recording the electric currents generated in an active muscle. Stedman's Medical Dictionary, 497. Radiculopathy is a disease of the spinal nerve roots. Stedman's Medical Dictionary, 1308.

ordered an MRI. (Tr. 175.) In another note dated December 11, 2006, he noted that he could not reproduce any pain whatsoever. (Tr. 176.)

On December 15, 2006, the MRI was performed with Mark H. Monroe, M.D., interpreting. The MRI revealed disc desiccation at L2-3, and to a lesser degree at L3-4 and L4-5. This MRI revealed no stenosis. The MRI further showed "marginal" nerve root contact at L3-4, disc desiccation and a bulged disc and "mild" protrusion at L4-5. (Tr. 184-85.) Later, Dr. Monroe was able to get copies of MRIs dated January 15, 2004 for comparison. He opined that there was slight progression of the previously described findings. (Tr. 186.)

On December 18, 2006, Faupel saw Dr. Acosta-Rodriguez, again complaining of leg and back pain. Dr. Acosta-Rodriguez reviewed the MRI results from January 15, 2004, and December 15, 2006, and found the same levels of injury in both. For Faupel's complaints of pain, he prescribed a Medrol Dosepak and Fentanyl patches.[13] (Tr. 173.)

Faupel saw Dr. Acosta-Rodriguez twice more on January 2, 2007, and January 16, 2007. Faupel reported that the Fentanyl patches were helping with his pain. Dr. Acosta-Rodriguez believed that his pain stemmed from a normal progressive aging phenomenon and not a work compensation injury. Based on this, Dr. Acosta-Rodriguez discharged Faupel on the 16th, stating he could return to work with no restrictions. (Tr. 166, 169.)

On February 3, 2007, Dr. Smith noted that he completed a form for Gasconade County documenting the "total disability" of Faupel due to a herniated disc and fused short right leg. (Tr. 241.)

On February 27, 2007, Faupel saw Chris Tatum, physical therapy assistant, for training in the use of a cane. Tatum opined that Faupel was ready and able to learn, and Faupel was discharged from physical therapy. (Tr. 237.)

On April 30, 2007, Smith wrote a note discussing Faupel's residual functional capacity. Smith cited Faupel's degenerative disc condition, possible spondylolysis, unequal leg lengths causing spinal scoliosis, and

---

[13]Medrol is used to treat a variety of conditions, including some pain based diseases such as arthritis. It also reduces swelling. Fentanyl is an opiate used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 7, 2010).

limited range of motion in concluding that his problems with back and leg pain were only likely to deteriorate.[14] Dr. Smith opined that Faupel is "disabled for all types of employment that he is trained to do. . . ." He limited Faupel to thirty minutes standing or walking at a time and no more than two hours per day. In addition, Dr. Smith recommended that he not bend, lift, stoop, crawl or carry at all. Given these limitations, Smith opined that Faupel was disabled. (Tr. 298-300.)

On May 2, 2007, Faupel went to the Veteran's Hospital for primary care and saw Janene Diekmann, R.N. He complained of continued insomnia, saying that the drugs he was currently taking were not helping. Nurse Diekmann prescribed new drugs for treatment. (Tr. 294-97.)

On May 3, 2007, Vale, a medical consultant, completed a residual functional capacity assessment for the Social Security Administration. (Tr. 242.) Vale found that Faupel could: lift twenty pounds occasionally, ten pounds frequently, stand and/or walk between two and four hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, and not push or pull due to limitations in lower extremities. (Tr. 243-44.) Vale also believed that Faupel could climb, stoop, and kneel occasionally, but never balance, crouch or crawl due to the fusion of his right knee. (Tr. 245.) Vale noted no limitations in manipulation, vision, or communication. (Tr. 245-46.) Vale found some environmental limitations, stating that Faupel should avoid concentrated vibration or hazards (machinery, heights, etc.) (Tr. 246.)

On May 17, 2007, an MRI was performed. James Toombs, M.D., diagnosed degenerative joint disease in the lumbar spine that appeared to be more significant at the L5-S1 level. (Tr. 287-88.) An x-ray performed the same day showed a "similar" appearance to previous x-rays. (Tr. 254.)

On May 21, 2007, Dr. Smith reviewed the MRIs. He found that the overall appearance was similar, and concurred with the diagnosis of

---

[14]Scoliosis is lateral curvature of the spine. Stedman's Medical Dictionary, 1394.

degenerative joint disease.  In addition, he concluded that there was no evidence of spinal stenosis.  (Tr. 300-01.)

On August 20, 2007, Faupel saw Christopher Wolf, M.D., at the Veteran's Hospital.  Faupel continued to complain of back pain related to his leg and work-related injury.  Dr. Wolf opined that he would be unable to work again due to these problems.  (Tr. 292-94.)

On September 12, 2007, Faupel saw Carole Bernard, Staff Psychologist, at the Veteran's Hospital.  After a discussion about his history and goals, Dr. Bernard diagnosed depression and chronic back pain.  (Tr. 291-92.)

On October 17, 2007, Faupel saw Dr. Toombs, complaining of continued pain in his hip and right leg.  Faupel expressed that he would be able to go back to work except for the pain he experienced.  Faupel also stated that he was able to complete many tasks around the house including driving.  In addition, he reported cutting eleven "truckloads of wood" the previous year.  (Tr. 286-87.)

On October 22, 2007, Faupel engaged in a telepsychiatry session with Dr. Twitty.  He complained of continued insomnia and pain.  He also said that he has been doing things around the house and watching a lot of TV. He further reported that his relationship with his girlfriend was going "a little rocky."  Dr. Twitty prescribed Amitriptyline and assigned a GAF of 58.[15]  (Tr. 280-83.)

On October 30, 2007, Faupel saw Dr. Smith, complaining of a painful and swollen right thigh.  Faupel had a history of staph infection in that leg and was placed on antibiotics for treatment.  (Tr. 273, 278-79.)

On November 5, 2007, Faupel saw Joshua Hamann, M.D., for a orthopedic surgery consultation at the Veteran's Hospital for a follow-up concerning his thigh infection.  A bone scan revealed possible osteomyelitis.[16] Dr. Hamann's report also noted that the infection in his thigh was clearing.  (Tr. 272-73.)

---

[15]Amitriptyline is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited July 10, 2010).

[16]Osteomyelitis is inflammation of the bone marrow and adjacent bone. Stedman's Medical Dictionary, 1109.

On January 14, 2008, Faupel engaged in a telepsychiatry session with Dr. Twitty. Faupel reported sleeping better, but he was having continued conflicts with his girlfriend. Dr. Twitty opined that Faupel was "remarkably" better on Amitriptyline than on other anti-depressant drugs, and increased the dosage. Faupel was assigned a GAF score of 65.[17] (Tr. 266-69.)

On April 30, 2008, Faupel saw Nurse Diekmann for primary care at the Veteran's Hospital. Nurse Diekmann noted that his leg was well healed (it is not clear if this is from the work related injury or the infection.) Faupel continued to complain of pain. The same drug regimen was maintained. (Tr. 262-65.)

On June 23, 2008, Faupel engaged in a telepsychiatry session with Dr. Twitty. Faupel reported that he had to go into court the next day for child support non-payment, and might have to go to jail. As a result of this stress, he was not sleeping well. However, prior to that, he was sleeping okay. He reported he was able to fall asleep quicker and sleep through the night with the increased dose of Amitriptyline. He also reported a good mood, and getting out of the house to see his son graduate. Dr. Twitty opined that aside from the acute stress caused by Faupel's legal problems he was "doing fine" and assigned a GAF score of 60. (Tr. 258-60.)

On August 28, 2008, Faupel saw Dr. Brenda Woods for physical rehabilitation at the Veterans' Hospital. He complained of continued back pain, stating that "some days loading wood to stove [sic]" made him feel worse. Dr. Woods provided new boots with a platform build up to help correct for his leg length difference. (Tr. 257.)

On November 3, 2008, Faupel engaged in a telepsychiatry session with Dr. Twitty. Faupel reported being able to sleep well, but was suffering

---

[17]On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

from extreme pain as a result of working on his car.  Dr. Twitty opined that Faupel was "more stable" and assigned a GAF score of 65.  (Tr. 305.)

**Testimony at the Hearing**

The ALJ held a hearing on February 17, 2009.  (Tr. 19.)  Faupel testified that the last time he worked was in September 2006 as a factory worker, building frames for display and jewelry cases.  He left that job due to an injury;[18] the worker's compensation claim stemming from that injury was in court at the time of the hearing.  Before that job, he worked at a nursing home doing heating and air conditioning repair work. Prior to that, he performed maintenance work for a realtor in St. Louis. (Tr. 23-25.)

Faupel testified that the pain he experiences in his lower back, left hip, and right leg prevents him from working.  The pain stems from a motorcycle accident where his leg was severed and subsequently reattached.  Faupel lost his knee completely, resulting in his leg being fused together.  He has no flexion at all in that leg.  (Tr. 25, 31-32.)

Faupel testified that because of the pain in his lower back, he is unable to bend, stoop, or lift.  He further testified that the medications he takes make him tired and drowsy.  He takes Percocet, Hydrocodone, Gabapentin, Ibuprofen, and some blood pressure medications. (Tr. 26.)

On an average day, Faupel wakes up around 6:30 and helps get the children in the house ready for school.  After they leave, he perhaps does the dishes and not a lot after that.  He is not sure how far he is able to walk, and he walks with the assistance of a cane.  (Tr. 26-27.)

In addition, he has problems sitting down.  He spends parts of the day moving around and switching between sitting, standing, and laying positions in an attempt to relieve the pain.  While medications help, they also make him tired and give him a hard time remembering to perform tasks.  (Tr. 28.)

---

[18]This conflicts with other evidence in the record indicating that Faupel injured himself at work in October, 2006.  (Tr. 239.)  The apparent contradiction is not mentioned in the ALJ's decision.

The ALJ then asked questions concerning a report from October 2007 that indicated that Faupel took care of five acres of land at that time. Faupel testified that he used to cut wood for the wood burning stove, but that was "a while back." For the last couple of years, due to his physical problems, he and his girlfriend have purchased wood. (Tr. 28-29.)

Brenda Young testified as a vocational expert (VE) in response to hypothetical questions posed by the ALJ. In the first hypothetical, the ALJ had the VE assume Faupel could perform no more than sedentary exertional work due to limitations on standing and walking. In addition, Faupel could: occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; occasionally balance or stoop; and never kneel, crouch, or crawl. In addition, Faupel could never push or pull or operate controls with his right leg. The ALJ had the VE further assume that Faupel should avoid concentrated exposure to cold, wetness, unprotected heights, vibration, and hazardous machinery. Under these circumstances, the VE testified that Faupel would not be able to return to his past work but could perform sedentary small product assembly work or sedentary telemarketing work. The VE testified there were approximately 3000 small product assembly jobs and 4500 telemarketing jobs in the St. Louis metro area. (Tr. 35-36.)

In the second hypothetical, the ALJ had the VE take the first hypothetical and add the limitation that the sedentary work must allow Faupel to alternate between sitting and standing every thirty minutes. The VE testified that if Faupel simply had to get up to stretch or adjust every thirty minutes, there would be no further limitation on his ability to work. However, if Faupel needed to work from a standing position, he would be limited to information clerk type jobs, of which there are approximately 500 in the St. Louis metro area. (Tr. 36-37.)

In the third hypothetical, the ALJ had the VE take the second hypothetical and add the limitation that any job must allow for occasional disruptions of both the workday and the work week due to pain, effects of medication, or the necessity to lie down. The VE testified that an individual with that restriction would be unable to perform any job in the regional or national economy. (Tr. 37.)

### III.  DECISION OF THE ALJ

The ALJ found that Faupel did not have an impairment or combination of impairments to met the criterion in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 10-11.)

He next formulated Faupel's residual functional capacity (RFC).  The ALJ found that Faupel had the RFC: to lift and carry at least ten pounds; to stand and/or walk two hours in an eight-hour day and sit six hours in an eight-hour day; to occasionally balance and stoop but never crawl, crouch, kneel or use ropes, ladders or scaffolds; not to work with exposure to extreme cold, wetness, humidity, vibration, industrial hazards, or unprotected heights.  Finally, the ALJ found that even if Faupel's depression were established, it was of sufficient severity to prevent, at most, skilled work.  (Tr. 11.)

In formulating this RFC, the ALJ found that Faupel had been diagnosed with depression not otherwise specified and a personality disorder.  However, he did not believe these mental problems rose to the level of disability.  He dismissed allegations of poor sleep noting Faupel's reported "extreme caffeine intake" as well as the effectiveness of medication.  The ALJ also took note of positive mood and demeanor at psychiatry sessions prior to Faupel's legal problems.  He also found the GAF score of 65 to undermine a finding of mental disability.  (Tr. 12.)

The ALJ found Faupel suffered from degenerative disc disease and some associated pain.  However, he noted that Faupel continued to perform gainful activity in nearly every year from 1992 to 2001 and again in 2004 and 2005.  (Tr. 13.)  He also found that medical treatment records did not support significant worsening of Faupel's leg condition as of the alleged onset date of December 21, 2006.  Dr. Acosta-Rodriguez's reports indicated that Faupel's complaints of pain were related to previously diagnosed issues.  The ALJ cited specific evidence in the medical record that showed degenerative disc disease without other, more serious conditions such as a confirmed herniated disc or severe stenosis.  (Tr. 14.)

The ALJ found a number of facts in the record to contradict a finding of disabling physical condition.  First, Dr. Acosta-Rodriguez's

- 13 -

observations that Faupel, other than vocal complaints of severe pain, exhibited absolutely no pain behavior during examination contradicted a finding of disabling limited function. (Tr. 14-15.) In addition, medical examinations revealing relatively normal strength and range of motion aside from Faupel's fused knee contradict a finding of disability. (Tr. 15.) Finally, Dr. Smith's finding that an MRI did not reveal stenosis detracted from the credibility of Faupel's disability claim. (Id.)

The ALJ also noted that Faupel's physicians did not find any persistent or adverse side effects from medication. (Tr. 16.) Faupel alleged significant limitations on his daily activities, but the ALJ found this not credible because they were self-reported. The ALJ found that "for the many reasons and factors that the claimant's allegations of disability are found not credible, so too are the claimant's allegations of severely limited daily activities found not credible." (Id.) In further finding Faupel's allegations not credible, he discussed his testimony that he cut firewood, cleaned his house, and performed all activities of daily living, including taking care of foster children when his girlfriend is not home. (Id.)

The ALJ also found that Faupel had legal difficulties due to his inability to pay child support, and was relying on Social Security Benefits to help pay for them. (Id.) This further undermined Faupel's credibility. (Id.) While the ALJ noted that Faupel's consistent work history weighed in favor of his credibility, he found this was outweighed by other evidence in the record. (Tr. 17.) Finally, the ALJ noted that Dr. Vale's RFC assessment reported that Faupel was capable of a significant range of light work, further undermining his claim. (Id.)

The ALJ relied upon the VE's testimony to determine that Faupel was incapable of performing his past relevant work. (Id.) Again relying on VE testimony, he then stated that Faupel could perform other work as a small product assembler or as a telemarketer. (Tr. 18.) Finding that these jobs existed in significant numbers, the ALJ ruled Faupel not disabled. (Id.)

# IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

- 15 -

In this case, the Commissioner determined that Faupel could not perform his past work, but that he maintained the RFC to perform other work in the national economy.

## V. DISCUSSION

Faupel argues the ALJ's decision is not supported by substantial evidence. First, Faupel argues that the ALJ failed to properly formulate his RFC under the relevant standards. Second, he argues the hypothetical questions posed to the VE did not capture the concrete consequences of his impairment.

### Formulation of RFC

Faupel argues the ALJ improperly formulated his RFC. Specifically, he argues that the decision fails to cite medical evidence to support its RFC conclusions, and improperly discounts the medical opinion of his treating physician. The undersigned disagrees.

The RFC is a function-by function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id.

Faupel first argues that the ALJ's RFC findings are not in accord with the standards contained in Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001), and Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000). (Doc. 18 at 16.) Because the RFC is a medical question, it must be supported by medical evidence contained in the record. Lauer, 245 F.3d at 704. In addition, a "treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh, 222 F.3d at 452.

The ALJ's decision met these requirements. <u>Lauer</u> requires the RFC determination to be based in medical evidence. 245 F.3d at 704. Here, there was substantial evidence in the record supporting the ALJ's decision. Faupel specifically argues that the ALJ failed to articulate a rationale supporting his conclusion that Faupel's mental health issues were not severe for twelve months. (Doc. 18 at 20-21.) To qualify for benefits, the disability, and not only the impairment, must have existed or be expected to exist for twelve months. <u>See</u> <u>Barnhart v. Walton</u>, 535 U.S. 212, 217 (2002). The mere presence of a mental disturbance is not necessarily disabling, absent a showing that the mental impairment is of such severity that a claimant cannot engage in any substantial gainful employment. <u>Dunlap v. Harris</u>, 649 F.2d 637, 638 (8th Cir. 1981).

The ALJ cited to multiple piece of evidence in the record that support his decision. (Tr. 12.) Taken together, these piece of evidence constitute substantial support of his conclusion. In August 2006, Dr. Twitty assigned a GAF score of 55, indicating only moderate impairment. (Tr. 219.) In January 2008, Dr. Twitty noted that Faupel was doing "remarkably" better on his current drug regimen, and assigned a GAF score of 65. (Tr. 266-69.) If an impairment can be controlled with medication, it cannot be considered disabling. <u>Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004). In June 2008, Dr. Twitty opined that Faupel was "doing fine," but under stress because of a legal concern. (Tr. 260.) Situational depression such as this is not considered disabling. <u>See</u> <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1040 (8th Cir. 2001). In addition, there is no evidence that Faupel deteriorated or decompensated in a work or work-like situation. <u>See</u> <u>Rose v. Apfel</u>, 181 F.3d 943, 945 (8th Cir. 1999) (finding the absence of certain facts to supporting a finding of no disability). There is also no evidence showing Faupel's daily activities were limited or restricted by any mental condition. <u>Id.</u> No medical professional hospitalized Faupel for mental impairments, or opined that he was disabled by any mental condition. <u>Id.</u> Therefore, the ALJ properly determined that Faupel's mental health issues were not disabling.

The ALJ's determination with regard to Faupel's physical limitations also meets the standard set out in <u>Lauer</u>. The ALJ found that although

Faupel suffered from some limitations, he could perform the work necessary for sedentary level employment. (Tr. 13-16.) There is substantial medical evidence in the record to support this conclusion. Faupel's motorcycle accident left one leg shorter than the other. (Tr. 272, 286, 298.) He was diagnosed with degenerative disc disease at several points in his spine. (Tr. 301.) However, the limitations recommended by Dr. Smith still allow Faupel to engage in sedentary level work. (Tr. 162, 300.) Moreover, MRI tests showed only mild or moderate symptoms, including no evidence of spinal stenosis. (Tr. 187, 301.) Dr. Acosta-Rodriguez did not observe any pain behaviors, let alone a level of pain justifying a finding of disability. (Tr. 180, 181.) Examinations showed normal strength, further supporting the ALJ's finding that Faupel was capable of sedentary level work. (E.g. tr. 194, 204, 240.) Therefore, there is substantial medical evidence in the record supporting the ALJ's decision.

In addition, the ALJ acted properly by initially giving weight to Dr. Smith's opinions, as required by Singh. (Tr. 13.) Upon reviewing the whole medical record, including other reports provided by Dr. Smith, MRI results, reports provided by Dr. Acosta-Rodriguez, medical examination notes from the Veteran's Hospital, and the testimony provided by Faupel, the ALJ came to the conclusion that Dr. Smith's medical opinion was inconsistent with substantial evidence in the record. Upon reaching that conclusion, the ALJ was no longer obligated to give the treating physician's opinion controlling weight. Singh, 222 F.3d at 452.

Next, Faupel argues that the ALJ improperly discounted Dr. Smith's opinion. In support of this, Faupel argues that Dr. Acosta-Rodriguez's reports are consistent with Dr. Smith's and that the ALJ failed to cite medical evidence to call into question Dr. Smith's opinion.

Faupel's first argument is that Dr. Acosta-Rodriguez's report is largely consistent with Dr. Smith's. (Doc. 18 at 19.) If this were the case, the ALJ may have been improper in discounting the opinion of Dr. Smith. The undersigned disagrees.

Faupel is correct that the two physician's opinions are not entirely at odds with one another. The reports agree on some objective aspects

- 18 -

of Faupel's injuries, including problems at L3-4 and L4-5 (Tr. 173, 184.)

However, the two sets of reports disagree on the extent of the symptoms. Dr. Smith opined that Faupel suffers from "total disability." (Tr. 241.) On another occasion, Dr. Smith wrote that Faupel is disabled from all types of work he is trained to do. (Tr. 300.) Dr. Acosta-Rodriguez, however, opined that he could not find "real credible evidence for anything neurologic that might be of significance." (Tr. 180.) Noting a complete lack of pain behaviors, Dr. Acosta-Rodriguez concluded that Faupel's complaints of extreme pain made "absolutely no medical sense" to him. (Tr. 181.) Finally, Dr. Acosta-Rodriguez released Faupel to work without any restrictions less than a month before Dr. Smith's conclusion of total disability. (Tr. 166.) Because the medical opinions of the two doctors differed significantly as to whether Faupel suffered from disabling medical issues, the ALJ properly characterized Dr. Acosta-Rodriguez's reports as inconsistent with those of Dr. Smith.

Faupel next argues that although the ALJ properly cited medical opinions and conclusions, he failed to cite medical evidence calling Dr. Smith's opinion into question. (Doc. 18 at 20.) An ALJ "may not draw upon his own inferences from medical reports." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003); Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975).

Here, the ALJ cited specific medical evidence in evaluating Faupel's mental condition as well as his physical complaints. (Tr. 12-14.) In addition, the ALJ did not draw the sort of inferences that Lund and Shontos prohibit. In Lund, the ALJ used objective diagnostic medical evidence to infer that the claimant in that case could continue to work. In rejecting the ALJ's decision, the court noted that the only medical evidence in the record that discussed his ability to work was favorable to the claimant. Here, the ALJ cited not only objective medical evidence, but also medical opinion evidence stating that Faupel could return to work. (Tr. 14-15.) In Shontos, the ALJ rejected a medical opinion favorable to the claimant, asserting (without basis) that the opinion did not incorporate certain facts. Here, the ALJ made no such unfounded assertion.

- 19 -

Faupel next argues that the ALJ improperly discounted the medical opinion of Dr. Smith subject to the criterion established in <u>Singh</u>. Given that the ALJ properly characterized and articulated the evidence inconsistent with Dr. Smith's opinion, there was substantial evidence supporting the ALJ's decision to grant Dr. Smith's opinion "little weight." (Tr. 17.) A "treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." <u>Singh</u>, 222 F.3d at 452. A treating physician's opinion may be discredited based on evidence other than medical opinions, including inconsistencies in medical records or claimant testimony. <u>Owen v. Astrue</u>, 551 F.3d 792, 799 (8th Cir. 2008); <u>Kirby v. Astrue</u>, 500 F.3d 705, 709 (8th Cir. 2007). It is the ALJ's function to resolve conflicts among the various treating and examining physicians. <u>Bentley v. Shalala</u>, 52 F.3d 784, 785 (8th Cir. 1995).

The assessments of consultative physicians cannot be considered substantial evidence for the purpose of removing controlling weight from a treating physician's opinion. <u>Henderson v. Sullivan</u>, 930 F.2d 19, 21 (8th Cir. 1991). However, a treating physician's conclusion that a claimant is "disabled" or "unable to work" does not carry any special significance, since it is the province of the Commissioner to make the ultimate determination of disability. 20 C.F.R. § 416.927(e)(1), (3); <u>Davidson v. Astrue</u>, 578 F.3d 838, 842 (8th Cir. 2009).

In arguing that the ALJ improperly discounted the opinion of Dr. Smith, Faupel argues that the ALJ relied largely or entirely on the opinion of a "nonexamining consultative physician." (Doc. 18 at 15, 21, 22.) This argument is without merit. The ALJ placed little emphasis on the findings of the medical consultant, finding only that report "fails to bolster the claimant's claim." (Tr. 17.) In addition, the decision cited a number of inconsistencies in the record, indicating that the ALJ considered a variety of medical sources. (Tr. 11-17.) Further, the ALJ stated that he considered all opinion evidence. (Tr. 11.) Even if the ALJ did not cite every piece of evidence relied upon to make a decision,

the failure to cite specific evidence did not indicate it was not considered. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

Faupel argues that his diagnosis of depression provides support for Dr. Smith's medical opinion. (Doc. 18 at 19.) Depression, when diagnosed by a medical professional, can act as objective medical evidence of pain to the same extent as an x-ray film. 20 C.F.R. § 404.1528; Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998). In Cox, plaintiff was repeatedly diagnosed with depression causing exaggerated feelings of pain. Id. Here, there is only one reference in the record that his depression has a pain component. (Tr. 221.) Moreover, the relatively mild nature of Faupel's depression (discussed above) further undermines this argument.

Here, there is substantial evidence in the record which is inconsistent with Dr. Smith's opinion. First, Dr. Acosta-Rodriguez opined that Faupel was not disabled and showed no pain behaviors, in direct conflict with Dr. Smith's opinion of complete disability. As Dr. Acosta-Rodriguez was an examining physician, the ALJ properly granted his opinion some weight. 20 C.F.R. § 404.1527(d)(1).

Second, Faupel performed substantial gainful activity in every year from 1992 to 2001 and again in 2004 and 2005. (Tr. 102.) Evidence that a claimant has worked for a period of time with the impairment, without deterioration of their condition, reveals an inconsistency in the record that justifies an ALJ's denial of benefits. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). The record shows no evidence of significant deterioration; MRI and x-ray results reveal, at most, slight changes to Faupel's condition. (Tr. 166, 173.) Dr. Acosta-Rodriguez's opinion that Faupel's condition is progressing normally due to his age further supports the ALJ's conclusion. (Tr. 166.)

Third, Faupel's daily activities are inconsistent with Dr. Smith's opinion. The record indicates that Faupel cut eleven truckloads of wood in the year prior to October 17, 2007. (Tr. 286.) In addition, Faupel was able to clean dishes and laundry, vacuum, load wood into a stove, work on his car, and take care of a number of foster children. (Tr. 124, 126, 257, 305.) Activities such as these are generally inconsistent with

complaints of disabling pain.  See Medhaug v. Astrue, 578 F.3d 805, 817
(8th Cir. 2009).

Fourth, Dr. Smith's own reports display inconsistency.  Dr. Smith
opined that Faupel was totally disabled less than two months after
releasing him to work with restrictions.  (Tr. 162, 241.)  There is
nothing in the record to support such a significant aggravation of
Faupel's injuries.

Fifth, the ALJ found Faupel's allegations not credible (Tr. 16-17.)
Faupel does not contest this finding.  Therefore, the fact that Faupel's
testimony is not credible serves as an inconsistency in the record.  See
Owen, 551 F.3d at 799.

Given that it is the ALJ's function to resolve inconsistencies in
the record, there is no merit to Faupel's claim that the "only medical
opinion" is that of Dr. Smith.  (Doc. 18 at 22.)  Therefore, the ALJ was
justified in discounting the medical opinion of Dr. Smith.  Strongson v.
Barnhart, 261 F.3d 1066, 1070 (8th Cir. 2004).  In addition, the evidence
which is inconsistent with Dr. Smith's finding of disability serves as
substantial evidence supporting the ALJ's decision.

**Vocational Expert Testimony**

Faupel next argues that the decision improperly relied on the
testimony of the VE because the hypothetical questions posed by the ALJ
did not capture the "concrete consequences" of Faupel's impairments.
(Doc. 18 at 22.)  Specifically, Faupel argues the hypothetical question
that the ALJ relied upon in rendering his decision was based upon a
flawed RFC determination.  (Id. at 24.)  The undersigned disagrees.

In support of his finding of no disability, the ALJ cited the VE's
response to a hypothetical question which described a person who could
perform sedentary exertional level work due to limits on standing and
walking; could occasionally climb stairs and ramps; never climb ropes,
ladders, or scaffolds; occasionally balance and stoop; never kneel,
crouch, or crawl; never push, pull, or operate controls with the right
leg; avoid concentrated exposure to extreme cold, wetness, unprotected
heights, vibration, or hazardous machinery; and only perform unskilled
work instead of skilled or semi-skilled work.  (Tr. 35.)

Hypothetical questions posed to a VE must precisely describe a claimant's impairments so that the VE may accurately assess whether jobs exist for the claimant. Newton v. Chater, 92 F.3d 688, 694 (8th Cir. 1996). VE testimony based on an insufficient hypothetical question may not constitute substantial evidence upon which a decision may be based. Id. at 695. A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

Here, the hypothetical question posed to the VE was proper. Faupel's sole argument on this point is that the hypothetical question was flawed as a result of an erroneous RFC determination. (Doc. 18 at 24.) As discussed above, the ALJ's RFC determination is supported by substantial evidence. In addition, the hypothetical posed to the VE accurately reflects the RFC determination made. There is a slight textual difference between the RFC in the decision and the hypothetical posed at the hearing. In the RFC, the ALJ found Faupel could lift and carry ten pounds, but limited his standing and/or walking to two hours in an eight-hour work day and sitting six hours in an eight-hour work day. (Tr. 11.) In the hypothetical posed at the hearing, the ALJ limited Faupel to sedentary work. (Tr. 35.) Sedentary work is defined as work which involves lifting no more than ten pounds and requires only occasional standing and walking (compared to light work, which requires a "good deal" of standing and walking.) 40 C.F.R. § 404.1567(a), (b). Because the RFC determination and the hypothetical question are functionally identical, and because the RFC determination was supported by substantial evidence, the question posed to the VE captured the concrete consequences of Faupel's impairments.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have fourteen days to file documentary objections to this Report and Recommendation. The failure

to file timely documentary objections may waive the right to appeal issues of fact.


                                        /S/   David D. Noce
                                   **UNITED STATES MAGISTRATE JUDGE**


Signed on December 28, 2010.